J-S57017-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE: ADOPTION OF E.J.O., MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: C.M., MOTHER | No. 1537 EDA 2015 |

Appeal from the Decree April 21, 2015
In the Court of Common Pleas of Montgomery County
Orphans' Court at No(s): 2013-A0133

_____

| | |
|---|---|
| IN RE: ADOPTION OF S.L.O., MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: C.M., MOTHER | No. 1538 EDA 2015 |

Appeal from the Decree April 21, 2015
In the Court of Common Pleas of Montgomery County
Orphans' Court at No(s): 2013-A0132

BEFORE:  MUNDY, J., OTT, J., and STABILE, J.

MEMORANDUM BY OTT, J.:                    **FILED SEPTEMBER 28, 2015**

C.M. ("Mother") appeals from the decrees entered April 21, 2015, in the Court of Common Pleas of Montgomery County, which involuntarily terminated her parental rights to her minor daughter, S.L.O., born in

February of 2010, and to her minor son, E.J.O., born in January of 2011 (collectively, "the Children").[1] We affirm.

This appeal arises from the petitions for involuntary termination filed by Mother's father, R.M. ("Maternal Grandfather"), and his wife, C.M. (collectively, "Appellees"), on July 26, 2013.[2] As discussed in greater detail, *infra*, the Children have been in the custody of Appellees since August of 2011, as a result of severe physical abuse inflicted on E.J.O. by Father. Mother faced criminal charges in connection with this abuse, due to placing E.J.O. in the care of Father, and then failing to seek out medical treatment for his injuries. The Children initially were subject to a no-contact order with Mother. The order was lifted with respect to S.L.O. in October of 2012, and with respect to E.J.O. in approximately December of 2013.

A termination hearing was held on March 10, 2015, March 12, 2015, and April 20, 2015. During the hearing, Appellees presented the testimony of Detective Michael R. Begley; Montgomery County Office of Children and Youth ("OCY") caseworker, Alison Karpowich; Maternal Grandfather; Maternal Grandfather's former spouse and Mother's mother, J.M.B.; Dr. Melissa Kennedy, who provided medical treatment for E.J.O., both before

---

[1] The parental rights of the Children's father, J.O. ("Father"), were terminated by separate decrees entered that same day. Father is not a party to the instant appeal.
[2] Appellees filed amended termination petitions on January 17, 2014.

and after his injuries; and Mother's current husband, J.N. ("Husband"). Appellees also called Mother to testify on cross-examination. The Children's guardian *ad litem* presented the testimony of Erica Paige Hesselson, who supervised visits between Mother and the Children on August 21, 2014, and August 27, 2014. Finally, Mother testified on her own behalf, and presented the testimony of Father's mother, C.O.; Mother's therapist, Billie Lee Orenbuch; and Mother's sister, D.M.

The evidence presented during the hearing revealed that Mother has a history of serious behavioral issues, which began when she was sixteen years old, as well as a history of violent and tumultuous relationships.[3] N.T., 3/10/2015, at 126-43. Mother began dating Father in the fall of 2008. ***Id.*** at 144. In January of 2009, Father attacked Mother, "grabbed her hair, dragged her down the steps of the front porch, kicked her in the stomach in the front yard, jammed dirt in her mouth, [and] tore her blouse open." ***Id.*** at 144-45. Despite this incident, Mother's relationship with Father continued. ***Id.*** at 148-49. In January of 2011, about a week after E.J.O. was born, Mother and Father had "a blowup" in front of the Children, during which Father kicked in a door, put a hole in the wall, and "was throwing things indiscriminately around the room." ***Id.*** at 153-56. Father also "scooped [S.L.O.] up and was threatening to take her." ***Id.*** at 156. Mother

---

[3] Mother was born in June of 1980, and was thirty-four years old at the time of the termination hearing. N.T., 3/12/2015, at 143.

obtained a temporary protection from abuse order (PFA) against Father, effective January 31, 2011. Exhibit P-5 (Temporary Protection from Abuse Order) at 1. A final PFA order was entered on April 12, 2011. Exhibit P-5 (Final Protection from Abuse Order) at 1. By the summer of 2011, Mother had a new boyfriend, R.L. N.T., 3/10/2015, at 158. Despite the PFA order, Father continued to spend time in Mother's residence. *Id.*

On the evening of August 12, 2011, at about 10:00 or 11:00 p.m., Mother went out to a bar to see R.L., and left E.J.O., then age seven months, in the care of Father. N.T., 3/12/2015, at 114-15. S.L.O. was not in the residence at the time, because she was visiting with Appellees. N.T., 3/10/2015, at 184-85. When Mother returned to her residence at approximately 3:00 a.m. on August 13, 2011, an argument ensued between her and Father. N.T., 3/12/2015, at 115-16. Mother called 911 to report that Father was in her residence and would not leave, in violation of the PFA order. N.T., 3/10/2015, at 22, 32. The police arrived, but Father already had departed. *Id.* at 39-40. Mother then sent text messages to R.L. for a period of about an hour. N.T., 3/12/2015, at 118. During this time, Mother observed drops and splatters of blood throughout her residence. *Id.* at 119. When Mother checked on E.J.O., she observed that his diaper was on backwards, and that there was "something wrong with his anus . . . ." *Id.* Despite this discovery, Mother did not seek immediate medical attention for E.J.O. *Id.* at 121. Instead, at approximately 4:45 a.m., Mother sent a text message to Maternal Grandfather, in which she stated, "Just come over

when you get this. [T]here is no way [I] can explain anything. [Y]ou need to come. [W]hat [I] have to show you is not good." N.T., 3/10/2015, at 184; Exhibit P-6 (picture of text message). Mother then went to sleep. N.T., 3/12/2015, at 119-22.

Maternal Grandfather noticed Mother's text message about five hours later, at 10:10 a.m., and drove to Mother's residence with S.L.O. N.T., 3/10/2015, at 185. "After a few minutes," Mother brought Maternal Grandfather to E.J.O. *Id.* at 186-87. Along the way, Maternal Grandfather observed a mattress with blood on it, as well as blood on a changing table. *Id.* A trash can in Mother's kitchen was "the most dramatic. It was filled to overflowing with wipes, paper towels, diapers. They were all bloody. There was blood on the kitchen floor." *Id.* at 187. Finally, Maternal Grandfather observed E.J.O., who "had a piece of skin hanging out of him," and immediately was alarmed. *Id.* at 188. Maternal Grandfather demanded that Mother take E.J.O. to the hospital. *Id.* Mother "absolutely refused," stating that "[i]f I take him to the hospital, they will take my children." *Id.* Maternal Grandfather insisted, and Mother finally permitted Maternal Grandfather to take E.J.O. *Id.* at 188-89. Before Maternal Grandfather left, Mother informed him that E.J.O. had not eaten "for days." *Id.* at 189. Maternal Grandfather rushed E.J.O. to the hospital. *Id.* at 191-92. Once there, it was determined that E.J.O had suffered serious injuries, which required that part of his intestines be removed. *Id.* at 194-95.

As a result of these events, Mother and Father were arrested and charged with a variety of offenses. Mother pled guilty to endangering the welfare of children and recklessly endangering another person. Exhibit P-41 (criminal docket for Mother) at 3-4. On October 26, 2012, Mother received an aggregate sentence of eleven to twenty-three months' incarceration, followed by three years of probation. *Id.*; Exhibit P-7 (sentencing transcript) at 59-61. Father pled guilty to aggravated indecent assault of a child, aggravated assault, and endangering the welfare of children. Exhibit P-4 (criminal docket for Father) at 5-6. On September 26, 2014, Father received an aggregate sentence of fifteen to thirty-five years' incarceration. *Id.*

Meanwhile, the Children were adjudicated dependent by orders dated August 30, 2011, and placed in the custody of Appellees. Exhibit P-8 (shelter care orders and orders of adjudication and disposition). By order dated November 27, 2012, the juvenile court relinquished jurisdiction with respect to S.L.O., because the child was in "the physical and legal custody of a fit and willing relative, specifically [Appellees]." Exhibit P-8 (Order for Termination of Court Supervision).[4] *Id.*

---

[4] The record does not contain an order relinquishing jurisdiction with respect to E.J.O. Nevertheless, there is no evidence in the record that the juvenile court maintained E.J.O.'s adjudication.

Beginning in February of 2013, Maternal Grandfather facilitated visits between Mother and S.L.O., which took place biweekly while Mother was furloughed from jail. N.T., 3/10/2015, at 213. Mother was unable to visit with E.J.O., as she was subject to a no-contact order as part of her criminal sentence.[5] Exhibit P-41 (criminal docket for Mother) at 4; Exhibit P-7 (sentencing transcript) at 60. Mother's visits ended in June of 2013, because Mother stopped receiving furloughs. *Id.* at 214.

Mother was released from incarceration on August 19, 2013, about three weeks after Appellees filed their involuntarily termination petitions. N.T., 3/12/2015, at 226. On August 30, 2013, Mother filed a petition for modification of custody, in which she requested shared legal and supervised physical custody of the Children.[6] *Id.* at 222-23; Exhibit RM-18 (Petition for Modification of Custody Order). In addition, on September 9, 2013, Mother filed a petition to modify conditions of parole, in which she requested that the no-contact order with E.J.O. be lifted. Exhibit RM-19 (Petition to Modify

---

[5] Mother initially was subject to a no-contact order with respect to both of the Children as part of her bail conditions. Exhibit P-8 (orders of adjudication and disposition).

[6] The record reveals that, by agreed upon order dated January 3, 2013, Appellees and the Children's paternal grandparents were awarded shared legal custody of the Children. Further, Appellees were awarded primary physical custody, and the paternal grandparents were awarded partial physical custody on alternating Sundays. Mother's Answer to Petition for Involuntary Termination of Parental Rights, 9/27/2013, at Exhibit B.

Conditions of Parole), at 3. By order dated December 23, 2013, the orphans' court granted Mother four weekly supervised visits with the Children, which the court subsequently extended. The record indicates that there were no visits from sometime in June of 2014, until August 18, 2014, when the court entered an order again granting weekly supervised visits. Soon thereafter, on September 4, 2014, the court suspended visitation.

Following the termination hearing, on April 21, 2015, the orphans' court entered decrees involuntarily terminating Mother's parental rights to the Children pursuant to 23 Pa.C.S.A. § 2511(a)(2) and (b). Mother timely filed notices of appeal on May 18, 2015, along with concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

Mother now raises the following issues for our review:

(1) Whether the [o]rphans' [c]ourt erred in terminating Mother's parental rights when it determined the existence of clear and convincing evidence that Mother lacked the capacity to provide the [C]hildren with essential parental care necessary for their well-being?

(2) Whether the [o]rphans' [c]ourt erred in terminating Mother's parental rights when it determined the existence of clear and convincing evidence that Mother would be unable to remedy the causes and conditions of the incapacity within a reasonable amount of time?

(3) Whether the [o]rphans' [c]ourt erred when it determined the existence of clear and convincing evidence that termination of Mother's parental rights would promote the [C]hild[ren's] needs?

Mother's brief at 6.

We review this appeal according to the following standard:

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis:

Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citing 23 Pa.C.S.A. § 2511). The burden is on the petitioner to prove by clear and convincing evidence that the asserted statutory grounds for seeking the termination of

parental rights are valid. ***In re R.N.J.***, 985 A.2d 273, 276 (Pa. Super. 2009).

Instantly, the orphans' court terminated Mother's parental rights pursuant to Sections 2511(a)(2) and (b), which provide as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> ***
>
>> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> ***
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2) and (b).

> In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the

causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted)). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted).

With respect to Section 2511(b), this Court has explained the requisite analysis as follows:

> Subsection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. In *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005), this Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." In addition, we instructed that the trial court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. *Id*. However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008). Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case. *Id*. at 63.

*In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010).

On appeal, Mother argues that the orphans' court failed to properly weigh her efforts to "rehabilitate herself and reestablish a bond with her children." Mother's brief at 23-24, 26-27. Mother insists that the court placed too much weight on other evidence, including evidence of events that

- 11 -

occurred when Mother was a minor.[7]   Mother's brief at 22-23.   Mother

further contends that the Children's needs and welfare would be promoted

by allowing her to maintain her parental rights.  *Id.* at 29.  Mother asserts,

*inter alia*, that she has a significant bond with the Children.  *Id.* at 28.

At the conclusion of the termination hearing on April 20, 2015, the

orphans' court explained its decision to terminate Mother's parental rights on

the record in open court.[8]   N.T., 4/20/2015, at 166-84.   The court

emphasized that Mother has a history of relationships with violent men, and

that she also has committed acts of domestic violence.  *Id.* at 177-78.  The

court lamented Mother's severe lack of judgment on August 13, 2011, and

found that Mother's poor judgment continues to the present day.  *Id.* at

178-81.  Finally, the court concluded that Mother will not be able to remedy

---

[7] In her brief, Mother suggests that the evidence of events which took place when she was a minor was unfairly prejudicial and irrelevant.  Mother's brief at 22.  We note that Mother has waived any challenge to the admission of this evidence, as she failed to include this claim in her statement of questions involved, and in her concise statement of errors complained of on appeal.  ***See Krebs v. United Refining Co. of Pa.***, 893 A.2d 776, 797 (Pa. Super. 2006) ("We will not ordinarily consider any issue if it has not been set forth in or suggested by an appellate brief's statement of questions involved, and any issue not raised in a statement of matters complained of on appeal is deemed waived.") (citations omitted).

[8] The orphans' court did not issue a written opinion.  Instead, the court entered orders on June 5, 2015, in which it indicated that the reasons for its decision could be found in the termination hearing transcripts.

her poor judgment within a reasonable period of time. *Id.* at 182. The testimonial evidence supports the court's findings, as follows.

Mother testified that she allowed Father to stay in her home as often as three nights per week prior to the events of August 13, 2011, despite the fact that she had a PFA order against him. N.T., 3/12/2015, at 107-08. Mother claimed that, when she discovered E.J.O.'s injury, she was "confused" by what she saw, and was "not in the right state of mind." *Id.* at 120-21. Mother stated that she cries every day, and has spent the last three years trying to figure out "why I didn't react in a normal way . . . ." *Id.* at 120, 123. Mother conceded that there was "no excuse" for her actions. *Id.* at 120. Mother explained that she now sees a psychiatrist each month and attends therapy weekly. *Id.* at 164. Mother also reported that she has completed parenting classes, and that she is "a better mom" and "a different mom." *Id.* at 221-22.

Mother further testified that she began dating Husband in April of 2012. *Id.* at 123-24. They married on October 24, 2012, and Mother gave birth to a son, K.N., in September of 2013. *Id.* at 127. Mother admitted that she recently faced additional criminal charges as a result of an incident of domestic violence involving Husband in August of 2014. *Id.* at 127-28. Husband testified that the incident involved Mother "trying to grab the keys from me" while he was holding K.N, and that he "got hit" during the tussle. *Id.* at 115. However, Husband also admitted there was "some macaroni

thrown and some orange juice thrown," during the incident, that a window was broken, and that Mother threw a bottle at a wall, which ricocheted and hit Husband. *Id.* at 110-113, 118. Mother pled guilty to two counts each of harassment and disorderly conduct and, on January 29, 2015, received an aggregate sentence of 360 days of probation. Exhibit P-41 (criminal docket for Mother) at 3-4.

Thus, the testimonial evidence supports the findings of the orphans' court that Mother's poor judgment renders her incapable of parenting the Children, and that Mother cannot, or will not, remedy this incapacity. Mother has a history of engaging in violent and dangerous activities, which culminated in the events of August 13, 2011. Moreover, it is clear that Mother's irresponsible behavior has continued, as evidenced by the incident of domestic violence between Mother and Husband in August of 2014. We discern no abuse of discretion by the orphans' court, and we conclude that Mother's conduct warrants termination pursuant to Section 2511(a)(2).

Having determined that the orphans' court properly terminated Mother's parental rights pursuant to Section 2511(a)(2), we now review the decrees pursuant to Section 2511(b).

The orphans' court concluded that it would be in the Children's best interests to be adopted by Appellees. *See* N.T., 4/20/2015, at 182-83. The court found that terminating Mother's parental rights would not sever any bond between Mother and the Children, and explained that, "I think your

children responded well on play dates with you as they would have probably responded on a play date with me even though they've never seen me before because I know how to play with kids. And that's not the same thing as a bond." *Id.* at 183. Again, the testimonial evidence supports the court's decision.

Maternal Grandfather testified that, following the events of August 13, 2011, Appellees cared for E.J.O., and assisted him in his recovery. N.T., 3/10/2015, at 201-210. E.J.O. was "doing just great" by the following summer, "with the exception of the potential long-term problems which still aren't taken care of . . . ." *Id.* at 210. Specifically, Maternal Grandfather stated that E.J.O. may never have full control over his bowels due to the injuries he suffered at the hands of Father. *Id.* at 273. S.L.O. also has been doing well. *Id.* at 211.

Maternal Grandfather further testified that he supervised visits between Mother and S.L.O. while Mother was furloughed from jail. *Id.* at 227. S.L.O. enjoyed her visits with Mother. *Id.* at 227-28. However, since beginning visits with Mother in February of 2013, S.L.O. has "become more concerned as to where people were, where they were going, when they were coming back." *Id.* at 216. Maternal Grandfather reported that "every single night since [visits] began, [S.L.O.] wakes up during the night; she comes in not horribly upset, I think it's just to check in, be comforted for a few minutes, goes back to sleep." *Id.* at 216. These behaviors have not

subsided since Mother's visits were ended. *Id.* at 216-17. Maternal Grandfather stated that S.L.O. does not ask about Mother. *Id.* at 220.

Ms. Erica Paige Hesselson testified that she is a licensed social worker, who is employed part-time at the Assurance Group. N.T., 3/12/2015, at 64. Ms. Hesselson explained that that she supervised two-hour visits between Mother and the Children on August 21, 2014 and August 27, 2014. *Id.* at 64. Ms. Hesselson noted that the Children were "comfortable" with Mother during the visits, and that the Children smiled. *Id.* at 67. During the visit on August 21, 2014, S.L.O. appeared happy to see Mother, and they hugged and kissed when they greeted each other. *Id.* at 69. E.J.O. was less familiar with Mother, and asked Mother if she was "mommy [C.]" *Id.* at 69-70. On August 27, 2014, Mother and the Children hugged and kissed when they greeted each other, and hugged and kissed when the visit was over. *Id.* at 70. However, the Children did not appear to be sad when either visit ended. *Id.* at 67-68.

Mother testified that her visits with the Children went well, and that "[w]e got closer and closer." *Id.* at 228. Mother stated that it did not take long for her to bond with E.J.O. *Id.* at 236. She explained that, "[m]aybe I'm not their caregivers, and maybe they have a stronger bond with my dad and [C.M.] But there was a bond after not knowing me that I never thought that would be [*sic*] instantly." *Id.*

Based upon the forgoing evidence, we discern no abuse of discretion by the orphans' court in terminating Mother's parental rights to the Children pursuant to Section 2511(b). At the time the Children were removed from Mother's care in 2011, S.L.O. was one and a half years old, while E.J.O. was seven months old. Since then, the Children have resided with Appellees, who have cared for them, and assisted E.J.O. with his recovery. Thus, the record supports the conclusion of the orphans' court that the Children would not have a strong attachment or bond with Mother. *See K.Z.S.*, 946 A.2d at 764 (observing that the relationship between K.Z.S. and his mother "must be fairly attenuated," given that K.Z.S. had been in foster care for most of his young life, and given that he had only limited contact with the mother during this time). Indeed, the record reflects that E.J.O. was not even sure who Mother was during one of their most recent visits. While there may be a greater attachment between Mother and S.L.O., it is clear that any bond is outweighed in the instant matter by S.L.O.'s need for permanence and stability. *See In re Adoption of C.D.R.*, 111 A.3d 1212, 1220 (Pa. Super. 2015) (concluding that the appellant mother's bond with C.D.R was outweighed by the mother's "repeated failure to remedy her parental incapacity," and by C.D.R.'s need for permanence and stability).

Accordingly, we affirm the decrees involuntarily terminating Mother's parental rights pursuant to 23 Pa.C.S.A. §§ 2511(a)(2) and (b).

Decrees affirmed.

*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*

*Date: 9/28/2015*